RECEIVED
MAY 26 2022
CLERK, U.S. DISTRICT COURT
ST. PAUL, MINNESOTA

# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

Timothy A. Chey

Plaintiff

-vs-

HRI Properties, LLC,

Metropolitan Airports Commission (MAC),

Defendants

Case No.: 22-cv-1429 KMM/DTS

**COMPLAINT**

**JURY TRIAL DEMANDED**

---

Plaintiff, Timothy A. Chey, on behalf of himself, by and through himself an attorney of record, brings this action for damages and other legal and equitable relief against Defendant HRI Properties, LLC, Minneapolis Airport Commission (MAC), State of Minnesota, and the City of Minneapolis, ("Defendants"). Plaintiff states the following for his claims against Defendant:

## I. PARTIES

1. The Plaintiff is a resident of Los Angeles and Honolulu, and is a citizen of the States of California and Hawaii.

2. Defendant HRI Properties, LLC (HRI) operates or operated Embassy Suites Minneapolis. At all times relevant to the allegations contained in this Complaint, Defendant HRI was registered to do business, and did conduct business, in the State of Minnesota.

3. Defendant Metropolitan Airports Commission (MAC) operates one of the largest airports in the nation. At all times relevant to the allegations contained in this Complaint, Defendant MAC was registered to do business, and did conduct business, in the State of

SCANNED
MAY 26 2022
U.S. DISTRICT COURT ST. PAUL

Minnesota. The Company operated and maintained the MSP Airport in Minneapolis, Minnesota.

## II. JURISDICTION AND VENUE

4. This Court has jurisdiction over the subject matter of this action pursuant to 28 USC 1332(a) because the matter in controversy exceeds $75,000.00, exclusive of costs, it is between citizens of different states, and because the Defendant has certain minimum contacts with the State of Minnesota such that the maintenance of the suit in this District does not offend traditional notions of fair play and substantial justice.

5. Venue in the United States District Court for the District of Minnesota is proper pursuant to 28 USC 1391(a)(2) because a substantial part of the events or omissions giving rise to the Plaintiff's claims and causes of action occurred in this judicial district, and because the Defendant was subject to personal jurisdiction in this judicial district at the time of the commencement of the action.

## III. GENERAL ALLEGATIONS

**Accidental Deaths in Minneapolis**

6. **Preliminary numbers from the Minnesota Department of Public Safety Office of Traffic Safety indicated that 394 people lost their lives on Minnesota roads in 2020. That was an increase from 364 in 2019 and 381 in 2018. It was also the highest number since 2015, when 411 people were killed.**

7. The airports around the U.S. and the world are notoriously dangerous for pedestrians, pilots, stewardesses, and ground personnel. Accidents and deaths are extremely high compared to other civilian sectors such as a supermarket or shopping mall.

8. Defendants are fully and completely aware of these dangers in running an airport.

9. <u>MSP is one of the busiest airports in the U.S. serving over 35 million passengers a year.</u>

10. Plaintiff would not have flown into or out of Minneapolis St. Paul Airport (MSP) had they known that the representations made by Defendant regarding standard airport safety at the airport were false, deceptive and/or misleading.

11. Plaintiff would never have broached Terminal 1 had he known or was aware that he would be dropped into oncoming traffic (See Exhibits A, B).

12. According to MSP's very own website, it reads in bold and clear language: "The Travel Confidently MSP program is a set of measures adopted over the last few months across the airport in partnership with airlines, concessionaires, federal agencies and others, **to give travelers a safer experience on their journeys.**" (bold emphasized)

13. In a letter to travelers on the official MSP website, Rick King and Brian Ryks, the Metropolitan Airports Chairman and Metropolitan Airports CEO, respectively, stated: "<u>**We want to keep travelers safe during every step of their travel journey through MSP,**</u> and that can only be achieved through cooperation and coordination among the many entities operating at the airport. Our efforts to provide a safe, positive travel experience are only as effective as our commitment to work together to achieve shared goals.

14. <u>*Nothing could be farther from the truth.*</u>

15. On or about 2020, Defendants changed their policy from dropping passengers off at the left side of Terminal 1 so all passengers must get off into the actual street (see Exhibit B).

16. This is not an exaggeration and is the grounds for this actual lawsuit.

17. This was always an extremely dangerous alternative to whatever Covid regulations they were busing: Dropping passengers into the street with oncoming cars that could hit them.

The sheer stupidity and lunacy is an embarrassment to any airport in the world, but more so in a First World industrial country.

18. *Plaintiff could have been killed*.

19. Plaintiff is a Harvard and USC alumnus, a well-respected attorney, philanthropist, and faith-based film producer and director of 15 films with two Academy-Award winning actors.

**The Plaintiff's Near-Death Catastrophe**

20. On or about Sunday, June 13, 2022, Plaintiff was taken to the Minneapolis airport (MSP) by the Hilton Embassy Suites airport shuttle bus run by Defendant HRI.

21. At no time did Plaintiff ever think he would be put in any danger – surely not by the airport safety planning protocols.

22. Plaintiff specifically went on the airport website to ensure smooth travel, especially understanding the difference between Terminal 1 and Terminal 2. He never saw any warnings that he would be unsafe.

23. As he was dropped off at Terminal 1 of the MSP departures area by Defendant HRI, Plaintiff unwittingly stepped right into the lane of traffic and saw a car heading right towards him. He feared for his life and safety (see EXHIBIT A – Youtube video of the airport security camera (SIDE 1).

24. Plaintiff was furious and it can be seen from other angles of the airport security according to MSP's attorney.

25. Plaintiff was so upset he shed tears later thinking about this incredible happenstance.

26. Plaintiff was on very important business that took him to Madison, Milwaukee, Chicago, Wheaton, Iowa City, Des Moines, OKC and later Dallas.

27. Plaintiff contacted the Chairman of the Minneapolis Airport Commission who then had the CEO contact Plaintiff.

28. The CEO, Brian Ryks, assured Plaintiff that immediate steps were being taken.

29. Mr. Ryks assured Plaintiff that they would install security guards immediately. Plaintiff then suggested the airport simply install red cones (pylons) to protect the passengers getting off.

30. Plaintiff thanked Mr. Ryks for what he thought was a sacrifice for the shocking experience. He wants to give everyone a second chance.

31. Plaintiff also had absolutely no intention to sue. He is a film director first; consumer litigation attorney second. Plaintiff is in pre-production on shooting a $50 million film early next year and is busy location scouting.

32. Plaintiff is one of the top faith-based writer/directors in the U.S. of over 15 feature films, including 'David and Goliath' (Jerry Sokolosky), 'The Genius Club' (Tom Sizemore, Stephen Baldwin) 'Suing the Devil' (Malcolm McDowell, Tom Sizemore, Corbin Bernsen), Showtime's 'Freedom' (Cuba Gooding, Jr., Sharon Leal, William Sadler), Fakin' Da Funk (Pam Grier, Bo Jackson, Ernie Hudson), Sony Pictures' "Slamma Jamma" (Michael Irvin, Jose Canseco), and 'The Islands' (John Savage, Mira Sorvino) was left with no alternative but to file this action in the wake of absolute careless and shocking disregard for the safety of passengers

33. Plaintiff has also made guest appearances on Fox News, NBC, TBN, and other national TV shows. His work has been disseminated in the Wall Street Journal, NY Times, LA Times, Roger Ebert, CNN, ABC Family, Lifetime, USA Networks, TRU, History

Channel, and over 100 more media outlets. He has over 10,000 fans on Facebook and 2,000 fans on Twitter.

34. Plaintiff still had the horrific images, stress, daytime nightmares of the car hitting him while he was on the road. It without doubt affect him immensely and still is almost 4 weeks later. Still, he was determined to forgive and move on.

35. Despite the horrendous stress, Plaintiff went through he was willing to forgive.

36. Plaintiff believed the airport would take care of the incident and that all was now safe. _However, this would not be the case._

37. On or about a couple days later, the airport personnel began calling and emailing Plaintiff asking Plaintiff questions about where he was and who he was – it was obvious to Plaintiff that they were questioning Plaintiff like they questioned the security guard at the Atlanta Olympics for the bombing. Plaintiff grew upset.

38. _The questions directed towards him were not about passenger safety and what they were doing to make Terminal 1 safer._

39. Plaintiff told them what he was wearing and they identified him as the correct person. (See Exhibit A).

40. Plaintiff was furious that they were treating him like he was lying or treating him to dissolve responsibility for the absolutely unsafe conditions at Terminal 1.

41. On or about Saturday, July 3, 2021 – three weeks later - Plaintiff received shocking and unbelievable photos and video from a Minneapolis resident showing nothing at Terminal 1 changed. _There was absolutely no changes made to people exiting into the lane of traffic._

42. _It was all a lie._

43. Plaintiff was furious that his almost fatal accident went unheeded and also that he might be the victim of racial injustice. Plaintiff plans to depose the entire commission and staff to see why his warnings were not heeded and why they accused him of fabricating the story.

44. Plaintiff has suffered severe and catastrophic emotional distress because of the incredible episodes – both with getting off the shuttle into the street; being subjected to questioning; and finally having his warnings being completely unheeded.

45. If even one person dies at Terminal 1 from the moment they were notified until now, all of the executives - who were hereby warned - should all be charged with second-degree or involuntary manslaughter.

## IV. CAUSES OF ACTION

## FRAUD AND DECEIT — COUNT I

46. Plaintiff repeats and realleges each and every allegation contained in paragraphs above as if fully set forth herein.

47. On or about June 15, Plaintiff contacted the Chairman of the Minneapolis Airport Commission by email.

48. Plaintiff then received a call from the CEO Brian Ryks.

49. Mr. Ryks assured Plaintiff that immediate steps were being taken.

50. Plaintiff decided not to further litigate the matter and would not file any lawsuit.

51. Three weeks later, Plaintiff received testimony and pictures and video that absolutely nothing was done. People were still being let out right into the lane of traffic. (See EXHIBIT B).

52. This was a complete slap in the face to Plaintiff who was incredulous to the lack of airport safety.

53. It doesn't matter that perhaps no one has gotten injured. No one was injured before the Miami Condo collapsed and killed over 160 people. Yet there were stark warnings. There are obvious stark warnings with letting passengers off into the road where cars are coming as easily seen in the video. (See EXHIBIT A).

54. Plaintiff was subject to interrogations about where he was – not for safety purposes – but to smear and discredit him. They purposefully lied to him to have him avoid escalating the matter causing Plaintiff more undue emotional distress.

55. Plaintiff plans to send interrogatories and production of document demands in late-July/early August with depositions of all parties responsible in early-September.

56. As a result of the failure, fraud, and negligence, Plaintiff sustained serious and severe injuries to his person, including, but not limited to, the following injuries: permanent anxiety; and other serious and severe emotional injuries.

## **BREACH OF IMPLIED CONTRACT — COUNT 2**

57. Plaintiff repeats and realleges each and every allegation contained in paragraphs above as if fully set forth herein.

58. On or about Sunday, June 13, 2022, Plaintiff was taken to the Minneapolis airport (MSP) by the Hilton Embassy Suites airport shuttle bus.

59. At no time did Plaintiff ever think he would be put in any danger – surely not by the airport safety planning protocols.

60. There was an implied contract between MSP airport and all passengers that there will safety protocols – not just Covid – but all safety to all passengers. <u>Surely not letting passengers off into oncoming traffic.</u>

61. As he was dropped off at Terminal 1 of the MSP departures area, Plaintiff unwittingly stepped right into the lane of traffic and saw a car heading right towards him. He feared for his life and safety (see EXHIBIT A – Youtube video of the airport security camera (SIDE 1).

62. <u>Plaintiff</u> was furious and it can be seen from other angles of the airport security according to MSP's attorney.

63. <u>Plaintiff was so upset he shed tears.</u>

64. Plaintiff contacted the Chairman of the Minneapolis Airport Commission who then had the CEO contact Plaintiff.

65. The CEO, Brian Ryks, assured Plaintiff that immediate steps were being taken.

66. The airport then began asking Plaintiff questions about where he was. Plaintiff grew upset.

67. Despite the horrendous stress Plaintiff went through he was willing to forgive.

68. On or about Saturday, July 3, 2021, Plaintiff received photos from a Minneapolis resident showing nothing changed. There was absolutely no changes made to people exiting into the lane of traffic.

69. Plaintiff, a Harvard and USC alumnus, carefully studied the MSP website to know where Terminal 1 and Terminal 2 was. Had he known of the absolutely and ridiculously dangerous ways the shuttle would drop passengers off, he would never have flown into MSP.

70. Plaintiff plans to send interrogatories in early-August and production of documents. Any evasive answers will be met with motions to compel with sanctions.

71. Plaintiff plans to depose in late-September:

    a. Brian Ryks – CEO of Metropolitan Airports Commission

    b. Rick King – Chairman of Metropolitan Airports Commission

    c. Phil Burke – Director of Operations

    d. Roy Fuhrmann – COO of Metropolitan Airports Commission

    e. Eduardo Valencia – VP of Information of Metropolitan Airports Commission

    f. Kate Hudson – Manager of Embassy Suites

    g. Other individuals with knowledge of the dangers of Terminal 1

## **STRICT LIABILITY — COUNT 3**

72. Plaintiff repeats and realleges each and every allegation contained in paragraphs above as if fully set forth herein.

73. The Defendants were at all times relevant hereto the owners and operator of MSP that is the subject of the action.

74. The dangerous design at Terminal 1 that Defendants operated, maintained, controlled, and operated were defective and unreasonably dangerous for its ordinary and expected use by hundreds of thousands of rushed passengers.

75. The dangerous design at Terminal 1 that Defendants operated, maintained, controlled, and operated were defective and unreasonably dangerous for its ordinary and expected use by hundreds of thousands of rushed passengers almost got Plaintiff killed.

76. Defendants owed a duty of care to the Plaintiff to design, manufacture, operate, control an airport terminal that is safe for all airport passengers and not hazardous to any passenger as it was to Plaintiff. Defendants breached this duty.

77. Defendants owed a duty of care to the Plaintiff to design, manufacture, operate, control an airport terminal that is safe for all airport passengers and not hazardous to any reasonable consumer or passenger. Defendants breached this duty.

78. Plaintiff suffered severe emotional stress and possible physical injury and damages as a direct and proximate result of the defective and unreasonably dangerous condition at Terminal 1 which Defendants operated.

## MINNESOTA FALSE STATEMENTS IN ADVERTISING ACT MINN. STAT. § 325F.67 – COUNT 4

79. Plaintiff repeats and realleges each and every allegation contained in paragraphs above as if fully set forth herein.

80. Minn. Stat. § 325F.67 provides in relevant part:

Any person, firm, corporation, or association who, with intent to sell or in anywise dispose of merchandise, securities, service, or anything offered by such person, firm, corporation, or association, directly or indirectly, to the public, for sale or distribution, or with intent to increase the consumption thereof, or to induce the public in any manner to enter into any obligation relating thereto, or to acquire title thereto, or any interest therein, makes, publishes, disseminates, circulates, or places before the public, or causes, directly or indirectly, to be made, published, disseminated, circulated, or placed before the public, in this state, in a newspaper or other publication, or in the form of a book, notice, handbill, poster, bill, label, price tag, circular, pamphlet, program, or letter, or over any radio or television station, or in any other way, an advertisement of any sort regarding merchandise, securities, service, or anything so offered to the public, for use, consumption, purchase, or sale, which advertisement **contains any material assertion, representation, or statement of fact which is untrue, deceptive, or misleading, shall, whether or not pecuniary or other specific damage to any person occurs as a direct result thereof, be guilty of a misdemeanor, and any such act is declared to be a public nuisance and may be enjoined as such.**

81. <u>Defendants violated Minn. Stat. § 325F.67 on their official website and official press releases and official communications</u>.

82. Defendants violated Minn. Stat. § 325F.67 by publicly misrepresenting that MSP's safety is priority #1 when in fact, <u>Terminal 1 is very unsafe</u> (See Exhibit D). This is not just coming from a vacuum, but Plaintiff expressly told the Executives and they still refused to make Terminal 1 safe by simply putting red cones out. How much more deceptive can anyone be?

83. Defendant made false representations and untrue statements about the MSP safey content of its safe practices to make passengers feel safe on its website, communications, marketing literature, and through representations made by its business representatives.

84. Defendant's misrepresentations were material because they related to facts that would naturally affect the passenger's decision to buy an airline ticket that would depart or land at MSP Airport and that a reasonable person, including Plaintiff and members of the Proposed Class, would have relied on the safety of the airport.

## NEGLIGENCE AND GROSS NEGLIGENCE — COUNT 5

85. Plaintiff repeats and realleges each and every allegation contained in paragraphs above as if fully set forth herein.

86. The Defendant owed to the Plaintiff a duty to use reasonable care in the Operations of Terminal 1 at MSP; the breach of which duty would have prevented or eliminated the risk that passengers would be killed or struck by a passing car. <u>Defendants breached this duty</u>.

87. The Defendant had a duty to comply with all statutes, laws, regulations, or

safety codes pertaining to the safety of the airport terminal, but failed to do so, and was therefore negligent. The Plaintiff is among the class of persons designed to be protected by these statutes, laws, regulations, safety codes or provision pertaining to the safety of the airport terminal.

88. Defendants had a duty to properly supervise, train, and monitor its respective employees, and to ensure their compliance with all applicable statutes, laws, regulations, or safety codes pertaining to the pertaining to the safety of the airport terminal.

89. The Defendant had a duty to comply with applicable federal, state, and local laws, ordinances and regulations, and that the airport terminals would be completely safe from at the very least gross incompetence, but it failed to do so, and was therefore negligent.

90. As a direct and proximate result of the Defendant's acts of negligence, the Plaintiff sustained injuries and damages in an amount to be determined at trial.

## NEGLIGENCE PER SE — COUNT 6

91. Plaintiff repeats and realleges each and every allegation contained in paragraphs above as if fully set forth herein.

92. Defendants had a duty to comply with all applicable state and federal regulations intended to ensure the safety and well-being of all passengers at the MSP airport terminals (1&2)

93. Defendants failed to comply with the provisions of the health and safety acts of both state and federal, and, as a result, was negligent per se in operating the airport and putting the safety of thousands of people at stark risk. The reason Plaintiff even has to spend countless time on this matter is the Defendants still refuse to implement safety standards that will protect the lives of innocent people. If even one person dies from the

moment they were notified until now, they should all be charged with second-degree manslaughter.

94. As a direct and proximate result of conduct by the Defendant that was negligent per se, the Plaintiff sustained injury and damages in an amount to be determined at trial.

## NEGLIGENT MISREPRESENTATION — COUNT 7

95. Plaintiff realleges and incorporates by reference each and every allegation contained in the foregoing paragraphs as though fully set forth herein.

96. At all times relevant to this cause, and as detailed above, the Defendants negligently provided Plaintiff, and the general traveling airport community with false or incorrect information, or omitted or failed to disclose material information concerning the Airport Terminals, including, but not limited to, misrepresentations relating to the following subject areas:

      a. safety of the airport shuttles to a dangerous terminal;
      b. lack of safeguards in letting passengers off;
      c. failure to provide any personnel to direct traffic,
      d. no lights or traffic stops or warnings to passengers

97. The information distributed by the Defendants to the public, all the passengers in general was in the form of reports, press releases, advertising campaigns, website, print advertisements, commercial media containing material representations, which were false and misleading, and omitted and concealed the truth about the dangers of Airport Terminal.

98. The Defendants' intent and purpose in making these representations was to deceive and defraud the public and the passengers, including Plaintiff and Plaintiff's agents; to gain the confidence of the public and the airport passenger community, to falsely assure them of the

safety of the airport terminals for use; and to induce the public and the travel agents, booking agents, passengers to continue flying into Minneapolis Airport.

99. The foregoing representations and omissions by the Defendants were in fact false. The Terminal at the Minneapolis Airport is indeed not safe, fit, and effective for human or passenger use in its intended and reasonably foreseeable use as an international airport terminal.

100. At the time the Defendants failed to disclose and misrepresented the foregoing facts, and at the time Plaintiff flew into Minneapolis Airport was unaware of said the Defendants' intentional and negligent misrepresentations and omissions.

101. As a direct and proximate result of conduct by the Defendant, the Plaintiff sustained injury and damages in an amount to be determined at trial.

## INJUNCTION

100. Plaintiff repeats and realleges each and every allegation contained in paragraphs above as if fully set forth herein.

101. Due to Defendants's wrongful conduct, breaches of contracts, breaches of obligations, fraud and deceit, Plaintiff is informed and believes that Defendants will continue to operate a very dangerous and reckless safety hazard at Terminal 1 at MSP airport endangering the general public, including the elderly **and must cease operations** until the outcome of this case is determined.

100. Unless such conduct is enjoined and restrained by an order of the Court, the general public will continue to suffer great and irreparable injury.

101. Plaintiff lacks an adequate remedy at law for the injuries that would be suffered as a result of Defendants's breach of the confidentiality provision and because pecuniary damages are

insufficient to wholly compensate Plaintiff for their injuries and because it is difficult to ascertain the amount of damages required to afford adequate relief.

102. Plaintiff thus requests that this Court grant a preliminary injunction and permanent injunction enjoining that these Defendants, and each of them, and their agents, servants, and employees, and all such persons acting under, in concert with, or for Defendants from continued sweepstakes to the unsuspecting public.

103. Preliminary numbers from the **Minnesota Department of Public Safety Office** of Traffic **Safety** indicated that 394 people lost their lives on **Minnesota roads** in 2020. That was an increase from 364 in 2019 and 381 in 2018. It was also the highest number since 2015, when 411 people were **killed.**

## V. DAMAGES

34. The Plaintiff has suffered general, special, incidental, and consequential damages as the direct and proximate result of the acts and omissions of the Defendant, in an amount that shall be fully proven at the time of trial. These damages include, but are not limited to: damages for general pain and suffering; damages for loss of enjoyment of life, both past and future; medical and medical related expenses, both past and future; travel and travel-related expenses, past and future; emotional distress, past and future; expert expenses, past and future; and all other ordinary, incidental, or consequential damages that would or could be reasonably anticipated to arise under the circumstances.

## PRAYER FOR DAMAGES

WHEREFORE, Plaintiff prays for relief on the entire complaint, as follows:

a. Judgment to be entered against all Defendants on all causes of action of this Complaint, including but not limited to:

    1. Physical and Mental pain and suffering in the past and which, in reasonable probability, he will continue to suffer in the future;

    2. Mental impairment and incapacity in the past and which, in reasonable probability, he will continue to suffer in the future;

    3. Mental anguish in the past and which, in reasonable probability, he will sustain in the future;

    4. Reasonable and necessary medical expenses for treatment received in the past and, based upon reasonable medical probability, the reasonable medical expenses he will need in the future; and

    5. Horrific lost of future job opportunities due to fear of traveling

b. Plaintiff be awarded full, fair, and complete recovery for all claims and causes of action relevant to this action;

c. Plaintiff be awarded all appropriate costs, fees, expenses, and pre-judgment and post judgment interest pursuant to the laws of the State of Minnesota as authorized by law on the judgments entered in Plaintiff's behalf; and,

d. Such other relief the court deems just and proper.

e. Ordering statutory prejudgment interest;

f. Awarding Plaintiff reasonable attorneys' fees and costs, to the fullest extent allowed by law; and

g. Granting all such additional and/or further relief as this Court deems just and equitable.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands trial by jury on all issues.

Dated: May 21, 2022

LAW FIRM OF CONSUMER JUSTICE

Respectfully Submitted By:

Timothy Chey, ESQ (in Pro Per / Pro Se)
Partner/Attorney at Law

Law Firm of Consumer Justice
Arco Tower
1055 West 7th Street
33rd Floor (Penthouse)
Downtown LA, CA 90017
LawFirmofConsumerJustice@activist.com;
Tel: 424 388 0058
Fax: 424 388 9233